HALE, CHAIRMAN, ET AL. *v.* BIMCO TRADING, INC., ET AL.

No. 418.  Argued February 6, 1939.—Decided February 27, 1939.

---

[7] See *Nichols* v. *Coolidge, supra,* p. 542; *Tyler* v. *United States, supra,* p. 505; *Helvering* v. *City Bank Co.,* 296 U. S. 85, 90.

*Messrs. H. E. Carter,* Assistant Attorney General of Florida, and *Patrick C. Whitaker,* with whom *Messrs. George Couper Gibbs,* Attorney General, and *Tom Whitaker* were on the brief, for appellants.

*Messrs. Martin H. Long* and *R. R. Saunders* were on a brief for appellees.

By leave of Court, *Solicitor General Jackson, Assistant Attorney General Arnold,* and *Messrs. Alfred Brunson MacChesney, Warner W. Gardner,* and *Alger Hiss* filed a brief on behalf of the United States, as *amicus curiae,* in support of the decree.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The case is here on appeal, under § 266 of the Judicial Code (28 U. S. C. § 380), to review the final decree of a three-judge District Court enjoining appellants, constituting the State Road Department of Florida, from enforcing against appellees relevant provisions of a Florida statute. Acts 1937, c. 18995, Fla. Comp. Gen. Laws, c. CVIII, § 4151 (512)–(519). The statute provides for the inspection of all imported cement and the payment for such inspection of a fee of fifteen cents per hundred pounds. A motion to dismiss the bill having been overruled and appellants having elected to stand on the bill, a final decree was duly entered.

At the threshold, a challenge to the jurisdiction of the District Court must be met. It derives from § 265 of the Judicial Code (28 U. S. C. § 379), for it is claimed that the injunction in effect stayed proceedings in the Supreme Court of Florida. Disposition of this claim entails a quick narrative of the course of litigation disclosed by the record.

On July 29, 1937, a petition for mandamus was filed in the Supreme Court of Florida by the State of Florida ex

rel. Florida Portland Cement Company to compel appellants, members of the State Road Department, to enforce the statute in question, and on the same day an alternative writ of mandamus was issued. Appellants' demurrer, raising the constitutionality of the statute, was overruled on October 12, 1937. *State* v. *Hale,* 129 Fla. 588; 176 So. 577. A peremptory writ of mandamus, on November 17, 1937, directed appellants to enforce the statute. Meanwhile, on November 4, 1937, appellee Bimco Trading, Inc. filed its bill of complaint in this suit to enjoin the enforcement of the statute as forbidden, *inter alia,* by Article I, § 8, cl. 3, and Article I, § 10, cl. 2, of the Constitution. On November 27, 1937, the District Court granted an interlocutory injunction restraining appellants from enforcing the statute. Thereafter, appellants moved the Supreme Court of Florida to stay the mandamus proceedings pending an appeal to this Court from the order of the District Court, and on December 9, 1937, the Florida court ordered "that all further proceedings and actions taken pursuant to the peremptory Writ of Mandamus heretofore issued in this cause, be and the same is hereby stayed until the final decision of the Supreme Court of the United States upon the constitutionality of the act involved in this cause and until the further order of this Court." This cause was then prosecuted with dispatch. On March 8, 1938, appellants' motion to dismiss, which had been filed on November 24, 1937, was overruled, and, appellants refusing to plead over, the District Court, on June 14, 1938, entered a final decree permanently enjoining the enforcement of the statute.

To invoke § 265 in these circumstances is to assert that a successful mandamus proceeding in a state court against state officials to enforce a challenged statute, bars injunctive relief in a United States district court against enforcement of the statute by state officials at the suit of

strangers to the state court proceedings. This assumes that the mandamus proceeding bound the independent suitor in the federal court as though he were a party to the litigation in the state court. This, of course, is not so. *Chase National Bank* v. *Norwalk,* 291 U. S. 431, 441.

Appellants are in effect contending that no proceedings are here available to bring the constitutionality of the Florida statute before this Court, once the state court directed its enforcement. The Supreme Court of Florida itself manifested no such strangling conception of § 265. It did not deem the proceedings initiated below as a denial of the right of way of a state court through an obstructive exercise of authority by a United States court. On the contrary, in staying "all further proceedings and actions" until this Court had finally passed upon its constitutionality, the Supreme Court of Florida recognized the propriety of the present proceedings as an orderly mode for invoking the ultimate judicial voice on constitutional issues. Therefore, § 265 has no relevance here. That provision is an historical mechanism (Act of March 2, 1793, 1 Stat. 334, 335) for achieving harmony in one phase of our complicated federalism by avoiding needless friction between two systems of courts having potential jurisdiction over the same subject-matter. *Wells Fargo & Co.* v. *Taylor,* 254 U. S. 175, 183. The present record presents no occasion for bringing this safeguard into play.

We turn, therefore, to the merits.

After reciting that "during the past twelve months approximately thirty per centum (30%) of all cement sold and used in Florida was manufactured in foreign countries and imported"; that cement is "an integral part of the construction" of "large numbers" of buildings; that "much of the foreign manufactured cement . . . brought into the State of Florida has been of inferior

quality"; that "the importation . . . and . . . use of foreign cement not only jeopardizes public safety but amounts to unfair competition being forced on this great industry in Florida," the legislature of that State, in 1937, enacted the statute in controversy. Section 1 authorizes the State Road Department of Florida "to fix a minimum standard for all cement offered for sale or sold or used" within the State. Section 2 enforces obedience to standards of quality thus to be set by the Department by provisions for inspection and for exaction of an inspection fee of fifteen cents per hundredweight. It is this section which gives the statute teeth. But this section—the scheme for inspection and for the inspection fee—applies only to "cement imported or brought into the State of Florida from any foreign country . . ." The statute thus renders the 70% domestic cement immune from its requirements of inspection and its attendant fee. According to the uncontested allegation of the bill of complaint, this inspection fee is "sixty times the actual cost of inspection." Apart from this allegation, the Government, appearing as *amicus* and more particularly on behalf of the national interest represented by the Trade Agreements Act (48 Stat. 943; 19 U. S. C. § 1351), gives perspective to the size of the fifteen cent fee by comparing it with the duty of six cents per one hundred pounds fixed by the Hawley-Smoot Act of 1930 (46 Stat. 590, 602; 19 U. S. C. § 1001, par. 205 (b)), and with the duty of four and one-half cents fixed by the Belgian Trade Agreement of 1935 (49 Stat. 3680, 3691; 19 U. S. C. § 1351).

As grounds for this discrimination in the incidence of an obviously onerous exaction as between foreign and domestic cement, the preamble of the statute states that "it is of paramount importance to the public safety that only cement measuring up to a minimum standard should be offered for sale, sold or used in the State of Florida,"

and that the importation "amounts to unfair competition being forced on this great industry in Florida." So far as public safety demands certain standards in the quality of cement, such safety is dependent on assurance of that quality by appropriate inspection no less of the 70% domestic cement than of the 30% obtained from abroad. That no Florida cement needs any inspection while all foreign cement requires inspection at a cost of fifteen cents per hundredweight is too violent an assumption to justify the discrimination here disclosed. The other justification—the competitive effect of foreign cement in the Florida market—is rather a candid admission that the very purpose of the statute is to keep out foreign goods. The Supreme Court of Florida gives no reason resting in local conditions for what appears to be a transparent discrimination in the imposition of heavy inspection fees as between imported and domestic cement, and none has been offered by appellants. The context of a particular statute may justify distinctive treatment of phases of interstate or foreign commerce. The circumstances may negative apparent discrimination in the difference of treatment. Such was the situation in *McLean & Co.* v. *Denver & Rio Grande R. Co.*, 203 U. S. 38, referred to by the Florida Supreme Court. But this is not that kind of a case. According the statute every presumption of validity, no reasonable conjecture can here overcome the calculated discrimination against foreign commerce.

Such assumption of national powers by a state has, ever since March 12, 1827 (*Brown* v. *Maryland*, 12 Wheat. 419), been found to be in collision with the Constitution. It can never be pleasant to invalidate the enactment of a state, particularly when it bears the imprimatur of constitutionality by the highest court of the state. But it would not be easy to imagine a statute more clearly designed than the present to circumvent what the Com-

merce Clause forbids. *Cook* v. *Pennsylvania*, 97 U. S. 566; *Voight* v. *Wright,* 141 U. S. 62. This makes it unnecessary to consider the objections urged under Article I, § 10, cl. 2.

The decree of the District Court is

*Affirmed.*